**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| v. | S2 11 Cr. 32 (JSR) |
| DON CHING TRANG CHU, a/k/a "Don Chu," | |
| Defendant. | |

---

## SENTENCING MEMORANDUM SUBMITTED
## ON BEHALF OF DON CHING TRANG CHU

---

James R. DeVita (JD5659)
Mark S. Morgan (MM8799)
**DAY PITNEY LLP**
7 Times Square
New York, New York  10036
Telephone:  (212) 297-2429

*Attorneys for defendant*
*Don Ching Trang Chu*

## <u>TABLE OF CONTENTS</u>

**Page**

INTRODUCTION ............................................................................................1

FACTUAL BACKGROUND..............................................................................2

SENTENCING FACTORS UNDER 18 U.S.C § 3553(A) ............................................7

APPLICATION OF THE SECTION 3553(A) FACTORS TO THIS CASE ..............................9

CONCLUSION ............................................................................................14

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Kimbrough v. United States,*
52 U.S. 85 (2007) ................................................................................................. 8

*United States v. Adelson,*
441 F. Supp. 2d 506 (S.D.N.Y. 2006) ................................... 1,8,9,10, 14

*United States v. Booker,*
543 U.S. 220 (2005) ......................................................................................... 7

*United States v. Crosby,*
397 F.3d 103 (2d Cir. 2005) ......................................................................... 8

*United States v. Gall,*
552 U.S. 38 (2007) ............................................................................................. 8

*United States v. Jones,*
460 F.3d 191 (2d Cir. 2005) ......................................................................... 8

*United States v. Preacely,*
628 F.3d 72 (2d Cir. 2010) ............................................................................. 7

**STATUTES**

18 U.S.C. § 3553(a) ............................................................................................ 1,8

18 U.S.C. § 3553(a)(1) ....................................................................................... 7

18 U.S.C. § 3553(a)(2)(B) ............................................................................. 12

18 U.S.C. § 3553(a)(2)(C) ............................................................................. 12

18 U.S.C. § 3553(a)(3) ..................................................................................... 11

18 U.S.C. § 3553(a)(4) ..................................................................................... 11

18 U.S.C. § 3553(a)(5) ..................................................................................... 11

18 U.S.C. § 3553(a)(6) ..................................................................................... 13

18 U.S.C. § 3553(a)(7) ..................................................................................... 11

28 U.S.C. § 994(j) ............................................................................................... 13

## INTRODUCTION

By his attorneys, Day Pitney LLP, Don Ching Trang Chu submits this memorandum to assist the Court in arriving at a fair, just and reasonable sentence. *United States v. Adelson,* 441 F. Supp.2d 506, 515 (S.D.N.Y. 2006).  Mr. Chu is scheduled to appear before Your Honor for sentencing on September 7, 2011.

This case represents an unusual departure from the typical insider trading cases that have come before the courts of this district in recent years. Unlike most recent insider trading cases, here the defendant is not seeking a sentence below the applicable guideline range.  As the government, the defense and the probation office agree, the guideline range in this case is from zero to six months. We are respectfully asking the Court to exercise the discretion given it by that guideline range to sentence Mr. Chu to a sentence of probation, with a special condition of probation that would permit him to travel freely to his home country of Taiwan to aid in the care of his aged and infirm parents, and to pursue a position of employment that is far more promising than his job prospects in the United States.  We respectfully submit that the "nature and circumstances of the offense and characteristics of the defendant," 18 U.S.C. § 3553(a)(1), fully justify such a sentence in this case.

## FACTUAL BACKGROUND

Don Chu was born in Taiwan on March 8, 1954. After graduating National Taiwan University in 1976, he came to the United States to further his higher education. He received a Master of Arts degree in mathematics at the State University of New York at Stony Brook in 1979, and a Master of Science degree in computer, information and control engineering from the University of Michigan in 1980. While a student at Michigan, he met his wife of nearly thirty years, Elinor Chen. Mr. Chu became a United States citizen in 1988.

After completing his education, Mr. Chu began working in the field of data transmission, including ten years as a consultant for AT&T, and became an expert in computer data transmission technology, including wireless technology. In one form or another, Mr. Chu worked as a consultant on product development and production for more than twenty five years. Not until he began working for Primary Global Research ("PGR") did he have even a peripheral involvement in the securities industry, and he has no formal training in it. Thus, Mr. Chu has never been educated or trained in securities practices or law, nor tested or licensed by any securities regulatory authority.

Even Mr. Chu's initial involvement with PGR did not relate to the trading of securities. His first contact with PGR came in approximately 2003, when Mr. Chu was living in Taiwan. A former employee of a US technology company with whom Mr. Chu had consulted on a wireless technology project, and who was one of the initial founders of PGR, asked Mr. Chu to meet two of his cofounders who would be coming to Taiwan for a presentation regarding a business plan. Also at that presentation was the Superintendent (the equivalent of President) of a prestigious university in Taiwan. The focus of the business plan, rather than the "expert network" PGR later became, was a software program designed to speed up the development time

for personal computer related hardware.  The two PGR founders who made the presentation, both of whom were former technology executives at Intel, were seeking the assistance of the university superintendent and Mr. Chu in finding Taiwanese investors for their new business venture, as well as potential outlets for their software product in the growing PC related hardware industry in Taiwan.

Mr. Chu began to work for PGR on a part time basis in early 2004.  He assisted PGR to establish an office in Taiwan and tried to find business opportunities there.  PGR's focus changed somewhat when its original founders were joined by a former executive of the Gerson Lehrman Group, the largest "expert network" company in the industry.  As Mr. Chu understood it, PGR's business objective was to provide market research and facilitate supply chain checks to assist Wall Street hedge fund managers in understanding market trends in particular segments of the technology industry.  Initially, PGR planned to accomplish this by preparing market research reports for its clients.  Later, it began facilitating telephone calls and meetings between its clients in the United States and industry experts in Taiwan.  PGR's Taiwan activities, however, always remained an isolated and small part of its business compared to its activities in the United States.

The most significant advantage of his employment with PGR for Mr. Chu was that it provided him with the opportunity to spend most of his time in Taiwan, where he needed to care for his elderly parents.  In Mr. Chu's culture, this was his highest responsibility as the eldest son. Even though he became employed by PGR on a full time basis in 2007, the demands on his time were sufficiently light that it left him ample time to care for his parents, particularly his mother, who needed (and still needs) to travel three times a week to the hospital for kidney dialysis.  Mr. Chu's primary work responsibility was to facilitate face to face meetings in Taiwan between PGR clients and consultants, which were usually scheduled around technology industry

conferences that occurred a few weeks before the end of each business quarter.  Although there were other duties, Mr. Chu's work schedule with PGR was very flexible, and much of his work could be accomplished via portable email device, allowing him to fulfill his family obligations without difficulty.  Of course, because of the somewhat limited nature of his involvement in the overall business of PGR, his compensation was relatively modest, $6,000 per month after he became a full time employee.  Nevertheless, since he was living with his parents, his financial needs were not substantial.  Furthermore, because his PGR employment required periodic travel to company offices in California and, to a more limited extent, New York, he was able to travel to the United States fairly regularly at company expense and spend time with his wife, who remained in New Jersey.

At the outset of his involvement with PGR, Mr. Chu believed its activities were legal and above board.  Although he was not particularly successful in recruiting consultants in Taiwan for the PGR network, most of whom were recruited from the United States, Mr. Chu was involved in that effort.  He was careful to advise potential recruits that PGR was not asking them to disclose confidential information of the companies for which they worked.  This is illustrated by a January 23, 2007 email from Mr. Chu seeking to recruit a potential consultant to the PGR network:

> PGR is an independent investment research firm based in Silicon Valley (Mountain View, California) that services large mutual funds located in the US, by managing a global network of experts. In short, we pay experts/consultants to speak over the phone with investment professionals about markets and technologies. With regards to this consulting relationship, *we respect and adhere to all confidentiality agreements that you may have* and will pay you an hourly consulting rate of $200 for the consultations you do. When we ask you to do a consultation, there is no obligation on your part and you can simply decline for any reason.

Exhibit A (emphasis added).[1]  Similarly, in a May 28, 2007 email to another potential consultant,

Mr. Chu wrote:

> We like to invite you on board of PG-Research, the ultimate financial marketing research firm, especially designed for investment and portfolio fund managers.  Our clients are major world-class funds who usually are not familiar with Asia market, but like to have better real-time information and latest developments in Asia industries. . . . Our service is quite simple and straight forward.  As needed basis, we may invite you to join conf-call, dinner, meetings, or sometimes just answering questions in the email.  *Our clients will not solicit any inside information, only your personal opinion or public information to share.  They also don't expect you to answer all questions, actually, you don't need to.*

Exhibit B (emphasis added).  Indeed, PGR's written agreement with its consultants at the time, a

copy of which was attached to a July 5, 2007 email from PGR's cofounder and chief operating

officer to a potential new consultant (a copy of which was also sent to Mr. Chu), contained the

following provision:

> No Confidential Information: I represent that my performance as a consultant of the Company does not and will not breach any agreement with my employer or to keep in confidence proprietary information acquired by me in confidence or in trust. I will *not disclose* to the Company or to any of its customers or partners *any nonpublic, confidential or proprietary information or material belonging to any previous or current employers or others*. I agree to *decline* any consultation that presents a conflict of interest or a perceived conflict of interest. If during the course of any consultation I believe that any of Company's customers seek to cause me to violate this agreement, I will immediately cease the consultation and inform Company of such potential violation.

Exhibit C (emphasis in the original).

Unfortunately, as time went on and Mr. Chu began carrying out his coordinating duties

for PGR, he learned that not all PGR clients were willing to abide by those restrictions, and some

of the PGR consultants were willing to cross the line as well.  Thus, although he was often not

---

[1] The text of this email, which exhibits a higher degree of facility with English than Mr. Chu possesses, appears to have been drafted for use by Mr. Chu by one of PGR's co-founders. Thus, it recites that "I was at Intel for 14 years doing chip design prior to founding PGR." Mr. Chu neither worked at Intel, nor founded PGR.  Nevertheless, his sending this email message to the prospective consultant demonstrates Mr. Chu's understanding at the earliest stage of his involvement with PGR that it was company policy to avoid and discourage disclosure of confidential, inside information.

present for the face to face meetings he arranged between PGR clients and consultants, and he did not participate in the telephone calls between them, on several occasions he was present when PGR clients asked for, and PGR consultants provided, information Mr. Chu knew to be material, nonpublic information.  Despite his discomfort on those occasions, Mr. Chu continued to facilitate meetings between those PGR clients and consultants.  In that way, he entered into the conspiracy to which he has pled guilty.  Later, Mr. Chu was asked to help recruit new clients for the PGR network, and his dealings with the cooperating witness in this case, outlined in the complaint and the Presentence Investigation Report ("PSR"), indicate that he was willing to suggest the potential availability of significant confidential information from consultants inside public companies operating in Taiwan as a reason to become a PGR client.

Nevertheless, even after he found himself in the position of participating in the subject conspiracy, Mr. Chu continued to try to operate within the law, and to make efforts to keep PGR within the law, when he believed he could.  Thus, in October 2010 – merely a month before his arrest in this case – Mr. Chu emailed two PGR recruiters instructing them to stop their efforts to recruit as a potential consultant an individual who had risen to a position with the company for which he worked that Mr. Chu believed made him an "insider."  Thus, Mr. Chu said:

> Hi guys,
>
> Good try.  But Eddie is an insider, illegal to recruit, not for PGR, nor for any client. Please stop talking to him.
>
> Cheers!
> Don

Exhibit D.  The potential consultant had become a vice president of his employer, and Mr. Chu believed this made him an "insider," "illegal to recruit."

Because of his lack of experience and training in the securities industry, and the difficulty in obtaining compliance training from PGR in Taiwan,[2] Mr. Chu's understanding of insider trading law at the time of the events at issue was flawed, to say the least. His misunderstanding was that unless the employee providing information held a position as a high level officer of the company, there was no "insider trading" *per se*. He did, however, understand that the consultants who provided material, confidential information to the PGR clients in his presence were violating their duty of confidentiality to their employers, and that it was wrong for them to do so. Unfortunately, he failed to appreciate fully the seriousness of that wrongful conduct, and failed to take the steps he should have to end it and prevent its recurrence.[3]

## SENTENCING FACTORS UNDER 18 U.S.C § 3553(a)

Since *United States v. Booker,* 543 U.S. 220 (2005), the United States Sentencing Guidelines are advisory rather than mandatory. The post-*Booker* sentencing regime requires "sentencing courts to treat the Guidelines only as a starting point, and then to craft an appropriate sentencing taking full account of the history and characteristics of the defendants'. 18 U.S.C. § 3553(a)(1)." *United States v. Preacely,* 628 F.3d 72, 84 (2d Cir. 2010) (J. Lynch concurring).

---

[2] Because of the time difference between the US and Taiwan, what compliance training classes PGR provided occurred when it was the middle of the night in Taiwan. Thus, even when there were webcasts for employees in both California and New York, they were at impractical times for Mr. Chu.

[3] In one circumstance only could Mr. Chu's conduct be regarded as more than the relatively passive participation previously described. One PGR client repeatedly asked Mr. Chu to locate a source for integrated circuit raw material order data. A friendly competitor of the client had access to such information but would not share it with the client. When Mr. Chu learned that an acquaintance of his who was an industry analyst had access to the such data, Mr. Chu arranged to obtain that information from the acquaintance on a monthly basis and provide it to the PGR client. Although the client told Mr. Chu that the information was not as current as the information his competitor was receiving, the client continued to pay PGR for the information for more than a year. Mr. Chu never learned the ultimate source of the information, or how the information was useful or valuable to the client, but he was nevertheless uncomfortable with the arrangement.

The guiding principle of section 3553(a) is to arrive at a sentence that is "sufficient, *but not greater than necessary*, to accomplish the goals of sentencing." *Kimbrough v. United States*, 52 U.S. 85, 89 (2007) (emphasis added). Judges have freedom to exercise discretion in fitting sentences to a defendant's individual circumstances, *United States v. Crosby*, 397 F.3d 103, 114 (2d Cir. 2005), and to give "consideration [to] the judge's own sense of what is fair and a just sentence under all the circumstances." *United States v. Jones*, 460 F.3d 191, 195 (2d Cir. 2005).

This Court is fully familiar with the § 3553(a) factors that apply in determining the sentence in a case of this nature, having applied them numerous times in insider trading cases, including quite recently in a case related to this one. *United States v. Donald Longueuil*, 11 Cr. 161 (JSR). Moreover, the Court has written carefully and thoughtfully on the subject of applying the § 3553(a) factors in white collar cases. *United States v. Adelson*, 441 F. Supp. 2d 506 (S.D.N.Y. 2006), *aff'd*, 301 Fed. Appx. 93 (2d Cir. 2008). It is, nevertheless, worth setting out those factors in order to discuss their application to Mr. Chu in this case. Even though we are seeking a sentence within the applicable guidelines range, those factors are still relevant. *United States v. Gall*, 552 U.S. 38, 49-50 (2007).

Section 3553(a) provides:

> (a) Factors To Be Considered in Imposing a Sentence.— The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider—

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;

> (2) the need for the sentence imposed—

>> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>> (B) to afford adequate deterrence to criminal conduct;

        (C) to protect the public from further crimes of the defendant; and

        (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

        (3) the kinds of sentences available;

        (4) the [Sentencing Guidelines]
* * *

        (5) any pertinent policy statement—
* * *

        (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

        (7) the need to provide restitution to any victims of the offense.

We respectfully submit that application of those factors to this case fully warrants a sentence of probation.

## APPLICATION OF THE SECTION 3553(a) FACTORS TO THIS CASE

As this Court noted in *Adelson*, § 3553(a) "gives first position to '(1) the nature and circumstance of the offense and the history and characteristics of the defendant.'" 441 F. Supp. 2d at 512-13. Here, both of those factors support a sentence of probation. While the offense of insider trading is clearly a serious one, Mr. Chu's role in the offense was peripheral.[4] He began his involvement with PGR with the best of intentions, advising prospective consultants that PGR would observe and respect confidentiality restrictions imposed by current and former employers. Mr. Chu's inexperience in the securities industry, however, put him at a distinct disadvantage in his dealings with the sophisticated investment professionals who were PGR's clients. Mr. Chu's

---

[4] The probation report concludes that because there was no defined organizational structure amongst the defendants, no aggravating or mitigating role adjustments were warranted. Presentence Investigation Report ("PSR") ¶ 32. One could argue that Mr. Chu's role was minor,

expertise was in technology, his facility with English was somewhat limited, and he was clearly overmatched by those PGR clients who were intent on abusing the opportunities to obtain confidential information afforded by the meetings with PGR consultants. Also, since Mr. Chu was well down the PGR hierarchy, he would have been risking his job if he jeopardized a valued PGR client relationship by challenging the conduct of a fund manager trying to gain an improper edge through the PGR network. In retrospect, that is exactly what he should have done, but at the time, as Mr. Chu has colorfully put it, he felt like "a bunny in the jungle." In a very real sense, like the defendant in *Adelson*, Mr. Chu was "sucked into" the insider trading conspiracy "not because he sought" to join it, but because he "feared the effects of exposing" it. 441 F. Supp.2d at 513.

It is significant as well that Mr. Chu did not personally benefit financially from the scheme. He did not trade, for himself or others, on the basis of any inside information. He received his relatively modest compensation from PGR for arranging meetings and calls, whether or not the participants in those meetings and calls observed the law or exchanged material, nonpublic information. He did not receive any financial benefit from the clients who took advantage of the opportunity presented by the meetings and calls to obtain inside information. Thus, his role was largely passive. Like the defendant in *Adelson*, his role was "closer (though not identical) to an accessory," albeit during the conspiracy rather than after the fact. *Id.* As the Court noted in *Adelson*, the position of accessory "has historically been viewed as deserving lesser punishment than accorded the instigators of the wrongdoing." *Id.* In *Adelson,* the Court relied on this factor, among others, to sentence the defendant substantially

---

but since the guidelines calculation applied resulted in a sentencing range of zero to six months anyway, a role adjustment would have been of no practical effect in Mr. Chu's case.

below the applicable guidelines range  Here, we are asking only that the Court sentence at the low end of the applicable range.[5]

Mr. Chu's personal history and characteristics also argue for a sentence of probation.  He has never before been in trouble with the law.  As is clear from the letters of support submitted from family and friends who have known him for many years, Mr. Chu is humble, hardworking, diligent and thoughtful.  *See* Exhibit E.  He is kind and considerate of others, and his integrity has been amply demonstrated during his many years as a technology consultant.  His involvement in the conspiracy underlying this case is an aberration from his past life, a product of his straying from the field in which he was trained and experienced – technology product design and development – into a field in which he was not only untrained and ill prepared, but to which he was also unsuited.  He was completely out of his element, and over his head, dealing with the highly sophisticated securities professionals trading millions of dollars in public securities for PGR's hedge funds client.

Mr. Chu now has an opportunity to return to the field in which he is trained and experienced.  He has a job offer from a small technology company in Taiwan to serve as its Engineering Director.   *See* Exhibit F.  While perhaps not directly on point, § 3553(a)(2)(D) reflects Congress's view that post conviction vocational and employment prospects for defendants are a relevant sentencing consideration.  Mr. Chu has been out of work since his arrest on the day before Thanksgiving in November of last year.  His employment prospects in the United States, given the current job market and his relative lack of facility with English, are

---

[5] Thus, a sentence of probation would be consistent with §§ 3553(a)(3) and (4).  There does not appear to be an Sentencing Commission policy statement that applies, so § 3553(a)(5) is not  relevant to this case.  As the presentence report indicates, there are no readily identifiable victims or losses here, PSR ¶33, so restitution is not an applicable factor.  18 U.S.C. § 3553(a)(7).  These § 3553(a) factors, therefore, require no further discussion.

hardly encouraging.  Thus, the job opportunity in question would go a long way toward setting him back on the path to becoming a productive member of society.  His ability to accept the position, however, obviously depends on his receiving a non custodial sentence which also permits him liberal travel to Taiwan.

An even more pressing and substantial reason for a sentence of probation, and to permit Mr. Chu to travel to Taiwan, is the need for him to resume the care of his elderly and infirm parents.  As indicated in the personal letter and medical records from his parents, Mr. Chu's 81 year old mother, Su-Feng Chien Chu, suffers from serious kidney failure and requires dialysis treatment three times per week.  *See* Exhibit G.  For some ten years prior to his arrest, Mr. Chu was the primary care giver for his mother.  Since he has been unable to return to Taiwan to resume those responsibilities, her health has deteriorated significantly.  The primary burden of caring for her has fallen on Mr. Chu's 85 year old father, Ofeng Chu, who has had serious difficulty coping with the situation.  *See* Exhibit G.  A sentence of probation, with the ability to travel to Taiwan, would substantially alleviate the dire situation.

None of the other sentencing factors in § 3553(a) dictate a sentence of incarceration.  There is no need "to protect the public from further crimes of the defendant," 18 U.S.C. § 3553(a)(2)(C).  Mr. Chu has learned his lesson, and his remorse is deep and genuine.  He presents no risk of recidivism.  Similarly, to the extent § 3553(a)(2)(B) addresses "specific deterrence," Mr. Chu has been sufficiently deterred from further wrongdoing by the pain and suffering he has caused his family and friends, as well as the very public humiliation of his arrest and prosecution and the extreme publicity surrounding them.

To the extent § 3553(a)(2)(B) refers to "general deterrence," which is also a component of § 3553(a)(2)(A) ("to reflect the seriousness of the offense [and] to promote respect for the

law"), a sentence of incarceration is not *necessary* to achieve that purpose. Section 3553(a) specifically directs the Court *not* to impose a sentence that is "greater than necessary" to achieve the sentencing purposes it sets out. If Congress believed incarceration in all cases of insider trading was required to achieve general deterrence, it would have established a mandatory minimum sentence, as it has for other offenses. If the Sentencing Commission thought that only incarceration could achieve the sentencing goals Congress assigned to it, the guidelines would not include a sentencing range of zero to six months, permitting a sentence of probation with no incarceration, for insider trading. In permitting sentences of probation in some insider trading cases, the Sentencing Commission was undoubtedly following Congress's direction to "insure that the guidelines reflect the general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense . . . ." 28 U.S.C. § 994(j). Thus, while the crime of insider trading is concededly serious, there are varying degrees of seriousness that require a nuanced approach to sentencing. Congress and the Sentencing Commission apparently agree that there are insider trading cases where a sentence of probation is appropriate, and where the goal of general deterrence does not make incarceration of the defendant "necessary." We respectfully submit that this is just such a case.

Furthermore, § 3553(a)(6) points out "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct . . . ." Mandating incarceration for Mr. Chu in this case simply because this case involves insider trading would create such a disparity. For example, in *United States v. Frederick E. Bowers,* 09 Cr. 496 (GBD), the defendant, a securities professional convicted of insider trading whose total offense level under the guidelines was 13, received a sentence of three years probation and 2000

hours of community service.  In *United States v. Ken Okada,* 07 Cr. 144 (DC), the defendant was also a securities professional convicted of insider trading, with a guidelines range of 30 to 37 months (including an enhancement for obstruction of justice), and received a sentence of three years probation, with one year of home confinement.  Since those two securities professionals received below guidelines sentences of probation, sentencing Mr. Chu to any period of incarceration because of a purported need for "general deterrence," when his guidelines range specifically permits probation, would create an unwarranted sentencing disparity in his case.

## CONCLUSION

This is not a case "where . . . the calculations under the guidelines have so run amok that they are patently absurd on their face . . . ." *Adelson, supra,* 441 F. Supp. 2d at 515.  Here they "provide reasonable guidance" and "are of considerable help . . . in fashioning a sentence that is fair, just and reasonable." *Id.*  We respectfully submit that a sentence of probation that allows Mr. Chu to travel to Taiwan would be "fair, just and reasonable."

Dated:  August 31, 2011
      New York, New York

**DAY PITNEY LLP**

By: _James R. DeVita_
     James R. DeVita (JD5659)
     Mark S. Morgan (MM8799)
     **DAY PITNEY LLP**
     7 Times Square
     New York, New York  10036
     Telephone:  (212) 297-2429

     *Attorneys for defendant*
     *Don Ching Trang Chu*

# EXHIBIT A

**Don Chu**

**From:**   Kelvin Chou [kelvin@kelvinchou.net]
**Sent:**   Friday, January 26, 2007 7:50 AM
**To:**     Don Chu
**Subject:** Re: Primary Global Research: Consulting Opportunity

Hi Don,
Thanks for your email.
I am actually the consultant for two foreign companies right now so I understand the whole situation. I would love to do consultation for your company, too. However, the rate they pay me is $400 per hour and if you can match it, that will be great.

Let me know. Thanks.

Best regards,
Kelvin Chou

     -----Original Message-----
     **From:** Don Chu [mailto:donchu@pg-research.com]
     **Sent:** Tuesday, January 23, 2007 02:33 AM
     **To:** kelvin@kelvinchou.net
     **Cc:** 'Don Chu'
     **Subject:** Primary Global Research: Consulting Opportunity

     Hello Kelvin;


     I saw your resume on Monster and I wanted to see if you would be interested in consulting for my firm Primary Global Research (?PGR?).


     PGR is an independent investment research firm based in Silicon Valley (Mountain View, California) that services large mutual funds located in the US, by managing a global network of experts. In short, we pay experts/consultants to speak over the phone with investment professionals about markets and technologies. With regards to this consulting relationship, we respect and adhere to all confidentiality agreements that you may have and will pay you an hourly consulting rate of $200 for the consultations you do. When we ask you to do a consultation, there is no obligation on your part and you can simply decline for any reason. These types of consultations are educational for our clients. Our internal staff has over 50 years of experience in the semiconductor and wireless industries (I was at Intel for 14 years doing chip design prior to founding PGR).


     Let me know if this consulting opportunity is of interest to you.


     Don Chu

     Managing Director, Asia Operations

     Primary Global Research

     donchu@pg-research.com

     (Cell-TWN) +886 939 926 636

# EXHIBIT B

## Don Chu

| | |
|---|---|
| **From:** | Hinet [yeh.russell@msa.hinet.net] |
| **Sent:** | Sunday, May 27, 2007 10:27 AM |
| **To:** | Don Chu |
| **Subject:** | RE: Welcome on board of PGR! |

Dear Don,

Woo...  I'm very glad and to be honor with your interesting invitation!
That seems to me is "I'm an old man now", Ha....

Well, I'm interested in this proposal.  Let's talk more detail about this
after your return.   And, I will visit your website to learn something more.

Thanks again and seeing you soon!

Best Regards,
Russell Yeh


**From:** Don Chu [mailto:donchu@pg-research.com]
**Sent:** Monday, May 28, 2007 1:06 AM
**To:** russellyeh@micb2b.com
**Cc:** Michaela Chang
**Subject:** Welcome on board of PGR!


Hi Russell,

Thank you for calling Eric on 5/25 and tlking to him.  As you can see, this is a fun arena for marketing and sales
guys to go beyond and leap into a financial world.  Hence, we get a chance to look at IT industry from different
viewpoints.  We also get to know many people in the industry.
Furthermore, our expert network is great for career development as a side benefit!

We like to invite you on board of PG-Research, the ultimate financial marketing research firm, especially designed
for investment and portfolio fund managers.  Our clients are major world-class funds who usually are not familiar
with Asia market, but like to have better real-time information and latest developments in Asia industries. Please
feel free to visit our website www.PG-research.com for a quick overview.  Your joining PGR expert network is a
superb plus to our clients.

Our service is quite simple and straight forward.  As needed basis, we may invite you to join conf-call, dinner,
meetings, or sometimes just answering questions in the email.  Our clients will not solicit any inside information,
only your personal opinion or public information to share. They also don't expect you to answer all questions,
actually, you don't need to.

For the consultation on the phone or thru email, we usually pay you NT$5000/hr with min. 1/2 hr rounded up to 1/4
hr. If you call USA, will pay you addition nt$600 for less than 1 hour, or nt1000 for over. And, a dinner session is
also paid 1 hour NT$5000 fixed though it may take longer time but it is fun and relaxing.  As mentioned, the
consultation takes no more than your personal opinion/feeling or public information.  It should have no conflict with
your job and business in any aspect.

Again, please feel free to contact me if you have any questions about PGR and how she serves clients.  Let's be
connected and work together!

Also listed above is Michaela who is PGR's Logistic Manager in TWN.  Please feel free to contact her for any
logistic support.

Hope to see you soon!

8/30/2011

Cheers!
Don Chu
Managing Director - APAC
Primary Global Research
Donchu@pg-research.com
(Cell-USA) +1 650 861 7663 <- in CA now
(Cell-China) +86 138 16683509
(Cell-TWN).  +886 922 224564/939926636

Skype: don-skype

# EXHIBIT C

**Don Chu**

| | |
|---|---|
| **From:** | Phani Saripella |
| **Sent:** | Thursday, July 05, 2007 4:32 PM |
| **To:** | jshangkuan@gmail.com |
| **Cc:** | Don Chu; Phani Saripella (phani@pg-research.com) |
| **Subject:** | PGR: Hi |

Hello Jason;
 It was good to talk to you about the consulting opportunity. Enclosed is the consulting agreement. Please sign and fax back and we are ready to go.

 Please send me a brief (5-6 lines) bio that I can use.

 Also, if you know of other experts who can consult for us, we would certainly appreciate the referrals.

Best Regards,
Phani Kumar Saripella
phone : 650-960-8118
mobile: 408-839-9217

phani@pg-research.com
www.pg-research.com

## CONSULTANT AGREEMENT

As used herein, the term "Company" refers to Primary Global Research, LLC and each of its subsidiaries or affiliated companies regardless of whether my consulting relationship is with Primary Global Research, LLC or any other subsidiary or affiliated company of Primary Global Research, LLC.

1) No Confidential Information: I represent that my performance as a consultant of the Company does not and will not breach any agreement with my employer or to keep in confidence proprietary information acquired by me in confidence or in trust. I will *not disclose* to the Company or to any of its customers or partners *any non-public, confidential or proprietary information or material belonging to any previous or current employers or others*. I agree to *decline* any consultation that presents a conflict of interest or a perceived conflict of interest. If during the course of any consultation I believe that any of Company's customers seek to cause me to violate this agreement, I will immediately cease the consultation and inform Company of such potential violation.

2) Not a Director of a Publicly Traded Company: I hereby certify that I am neither member of the board nor an officer of any company, the securities of which are publicly traded.

3) Prior Approval Requirement, Confidentiality of consultation: I agree that all consultations and related expenses need to be approved by the Company. I agree that all consultations with Company's customers are confidential and the sole property of Company.

4) Not an Employee of Company: I agree that this Agreement is not an employment contract and that I will not, at any time, be an employee of the Company. I further understand and agree that I am <u>not</u> eligible for any Company benefits, including, but not limited to, group health insurance, workers' compensation, vacation, profit sharing or retirement benefits.

5) Complete Agreement: This Agreement sets forth the entire agreement and understanding between the Company and me relating to the subject matter herein and merges all prior discussions between us. No modification of or amendment to this Agreement nor any waiver of any rights under this Agreement will be effective unless in a writing signed by an executive officer of the Company and me. I understand and agree that any subsequent change or changes in my duties, hourly fee or compensation will not affect the validity or scope of this Agreement.

6) Effective Date: This Agreement shall be effective as of the first day of my consulting relationship with the Company. This agreement shall be considered terminated upon written notice from either party to the other.

7) Interpretation and Enforcement: Although I may provide consulting services for the Company outside of California or the United States, I understand and agree that this Agreement shall be interpreted and enforced in accordance with the laws of the State of California.

I have read this agreement carefully and understand and accept the obligations which it imposes upon me without reservation. I further agree that violation of any of the policies set forth may result in immediate termination of my relationship with company.

_____

Consultant Signature

_____

Consultant Name (Please Print)

_____

_____

Consultant Address (for payment)

_____

Date

Return Signed Document to:
Phani Saripella
Chief Operating Officer
1975 W El Camino Real, #300
Mountain View, CA 94040
Fax +1-650-469-0900

# EXHIBIT D

Don Chu

| | |
|---|---|
| **From:** | Don Chu |
| **Sent:** | Friday, October 22, 2010 10:57 AM |
| **To:** | Stan Pamintuan; Sherwin Co |
| **Subject:** | Fw: Fwd: Consulting Opportunity |

Hi guys,

Good try.  But Eddie is an insider, illegal to recruit, not for PGR, nor for any
client.  Please stop talking to him.

Cheers!
Don


-----Original Message-----
From: Don Chu
To: 'eddiechangtw@gmail.com'
Sent: Fri Oct 22 07:53:29 2010
Subject: Re: Fwd: Consulting Opportunity

Sorry, a mistake.  Will notify new recruiters immediately. Hope all is well thru
typhoon.  *_*



-----Original Message-----
From: Eddie Chang
To: Don Chu
Sent: Fri Oct 22 07:08:52 2010
Subject: Fwd: Consulting Opportunity

FYI

----------?????----------
???:"Stan Pamintuan (Linkedin Requests)" <requests-noreply@linkedin.com> ??:2010 10 22
22:05 ??:Consulting Opportunity ???:"Eddie Chang" <eddiechangtw@gmail.com>


LinkedIn

INMAIL: YOU HAVE A NEW MESSAGE

From: Stan Pamintuan

Date: 10/22/2010

Subject: Consulting Opportunity

Hi Eddie,

Good day! My colleague Sherwin Co have called you last week to discuss a great
opportunity that will benefit you. He would like to ask if your familiar with a company
called Mediatek. And if your able to discuss it's general market trends.

PGR is an independent investment research firm that services large mutual funds located
in the US, by managing a global network of experts. I hire top professional in
different field and match them to our clients who would like to learn more in their
investment research.

We pay you a minimum of $200/hour to speak over the phone at your own time preference
and discuss about relevant issues in the space. The purpose of these consultations is
educational for our clients, and we respect and adhere to all confidentiality
agreements you may have.

1

Please contact my colleague Sherwin Co I've posted his contact information. Thank you!

Sherwin Co
Primary Global Research LLC,
Phone 650 492 5060
Email sherwin@pg-research.com
www.pg-research.com

View/reply to this message <http://www.linkedin.com/e/-la93o8-
gfl4uq7q-3l/VVoSRCDcKwIihyDH2_rSOkY-KxTie11OAX0/mbi/I2418339759_2/>

Don't want to receive e-mail notifications? Adjust your message settings
<https://www.linkedin.com/e/-la93o8-gfl4uq7q-3l/cse/> .

© 2010, LinkedIn Corporation

# EXHIBIT E

# Submitted In Camera

# Exhibit F

# Submitted in Camera

# Exhibit G

# Submitted in Camera